Carolyn KOPP, Guardian of the Estate of Scott Kopp, a minor, et al., Appellants,

v.

C. C. CALDWELL OPTICAL COMPANY, C. C. Caldwell Opticians, Inc., and American Optical Corporation, Respondents,

and

G. R. Keirstead et al., Defendants.

No. KCD 27566.

Missouri Court of Appeals, Kansas City District.

Feb. 8, 1977.

Motion for Rehearing and/or Transfer Denied Feb. 28, 1977.

Application to Transfer Denied April 11, 1977.

M. Randall Vanet, Vanet & Reardon, North Kansas City, for appellants.

Edward W. Mullen, Donald C. Bollard, Deacy & Deacy, Kansas City, for Caldwell.

Harold T. Van Dyke, Linde, Thomson, Fairchild, Langworthy & Kohn, Kansas City, for American Optical.

Before TURNAGE, P. J., and WELBORN and HIGGINS, Special Judges.

ROBERT R. WELBORN, Special Judge.

Action for damages for personal injuries sustained by Scott Kopp, a minor, when the eyeglasses he was wearing were broken by a rock thrown by another minor, Curt Keirstead, causing glass to enter Scott's eye and damage it. Scott brought suit by his mother as guardian against Keirstead and his parents. Scott's parents also brought suit against those defendants for damages they claimed as a result of their son's injuries. The claims against the Keirsteads were settled by payment of $11,000 to Carolyn Kopp as Scott's guardian and $8,500 to Carolyn and her husband, Earl E. Kopp.

The plaintiffs joined in their action claims against C. C. Caldwell Opticians, Inc., the seller of the eyeglasses to the Kopps, C. C. Caldwell Optical Company, the operator of a laboratory which processed the lenses sold by Caldwell Opticians, Inc., and American Optical Corporation which allegedly manufactured the lenses processed and dispensed by the Caldwell companies. The petition alleged various grounds of liability of each of the defendants. Upon trial, plaintiffs' claims were submitted on strict liability. The jury returned a verdict in favor of defendants. After the motion for new trial was overruled, plaintiffs appealed.

Scott Kopp, born September 19, 1962, first saw Dr. Calvin Curts, M.D., a Kansas City ophthalmologist, in December, 1967. On June 10, 1968, Doctor Curts prescribed eyeglasses for Scott, calling for a plus lens to correct far-sightedness. According to Mrs. Kopp, she told Doctor Curts that she wanted "the special type [glasses] for children" and Doctor Curts pointed out that he had written "tempered" on the prescription. According to Doctor Curts, he prescribed tempered lenses for children "so that they wouldn't be running around with breakable glass on their faces."

Mrs. Kopp took the prescription to a retail store in Kansas City owned and operated by C. C. Caldwell Optical Company. She and Scott selected a reinforced frame and Mrs. Kopp told the Caldwell employee with whom she dealt that she "wanted the special glasses for children." She was told: "You are going to get them. The doctor has written tempered at the top and also reinforced frames." Mrs. Kopp asked: "Now, these are going to take care of him, right?" She was told: "Yes, they are shatter-proof, they are safer, they are stronger, you are not going to have any problems." He told Mrs. Kopp: " * * * [T]hat is what tempered meant, that they were heat-treated to make them stronger and that they would crack but not break."

Lee Bonner, an optician employed by Caldwell Optical as a dispenser, was the person with whom Mrs. Kopp dealt. He did not recall the transaction with Mrs. Kopp, but he recognized his handwriting on the prescription which Mrs. Kopp brought in. He stated that he never told purchasers of dress thickness tempered lenses that they would not shatter or come out of the frame or that they would crack but not break. According to him, when the completed glasses were returned from the laboratory, they were accompanied by a blue card which contained the following language:

"Your lenses have been heat-treated for greater protection against breakage.

Should they break, you will find that they do not sliver as much as ordinary glass, thereby offering some protection from eye injury." Mrs. Kopp denied that she received such a card.

The spectacles were prepared and delivered to Mrs. Kopp and Scott who wore the first set without incident.

In November, 1968, Doctor Curts saw Scott and revised his spectacle prescription. Mrs. Kopp again went to Caldwell Optician Landing store to obtain the new spectacles. She dealt with an employee named Joe Zajic who was dead at the time of the trial. The question of proof of conversation between Mrs. Kopp and Zajic is one of the matters involved on this appeal, the trial court having excluded Mrs. Kopp's testimony under the Dead Man's Statute.

The Caldwell prescription form for the changed spectacles had the word "Tempross" written across it. "Tempross" is a registered trademark of American Optical Company for lenses manufactured by American and designed to be heat-treated.

The glasses were made, with the lenses heat-treated by Caldwell Optical laboratory, and delivered to Mrs. Kopp.

On June 12, 1969, while he was wearing the glasses, Scott got into a rock fight with Curt Keirstead. A rock thrown by Curt struck the left lens of Scott's glasses, knocking the lens from the frame. The only portions of the lens found were those in Scott's eye. Two small pieces were taken from around his eye. A small piece of glass about six millimeters long, 2½ millimeters wide and less than a millimeter thick was removed surgically from the anterior chamber of Scott's left eye by Doctor Curts on June 13. This particle of glass had penetrated the cornea, gone through the iris and punctured the anterior capsule of the lens. It had caused a traumatic cataract which was removed with complete destruction of the lens which was replaced with a contact lens. The injury caused a permanent defect but there is no necessity to detail here its effect. At the trial, plaintiffs had evidence of special damages of some $5,700.00.

Much of the evidence at the trial dealt with the method and result of heat treatment of spectacle lenses.

In the heat treatment process lenses are heated to near the softening temperature of the glass. The lens is then removed from the heating device and the outside surfaces rapidly cooled by jets of air. The interior portion of the lens cools more slowly than the exterior surfaces, causing the outside surfaces to be in compression and the interior in tension. The result is that the surface glass has increased resistance to failure because glass is stronger in compression than in tension.

In 1964, the American Standards Association published "American Standard Prescription Requirements for First Quality Glass Ophthalmic Lenses" (Z80.1–1964), the accepted standard in the optical industry at the time Scott's spectacles were prepared. These standards described two types of heat-treated lenses, "Dress Eyewear Heat-Treated Lens" and "Heat-Treated Industrial Safety Lens." Because of its greater thickness (a minimum "edge or center of 3.0 mm") the latter lens has a greater resistance to breaking but it is not ordinarily prescribed for children. There was no contention that Scott was intended to have "Industrial Safety" lenses.

Prescription Requirements of the Standard required Heat-Treated Dress Eyewear to have "Minimum thickness, 2.0 mm." The specified testing procedure was:

"Unmounted lens shall withstand an impact test of a steel ball dropped 50 inches as follows: Notched or drilled—Ball size—½ inch. Beveled—Ball size—⅝ inch."

In November, 1968, the Caldwell laboratory used a hardening unit manufactured by Precision-Cosmet Company. The equipment included a "Drop Ball Tester." Industrial Safety lenses which they heat treated were subjected to the drop ball test, but dress safety lenses were not so tested by Caldwell. Neither the president of the

Caldwell companies nor the bench foreman for Caldwell laboratories in 1968, who was responsible for quality control of Caldwell laboratory's output, was familiar with the Z80.1 standard for drop balling for dress lenses. The manual used by Caldwell in the operating of the heating unit was placed in evidence by plaintiffs. The content and use of the manual by Caldwell counsel on final argument are the source of appellants' first assignment of error, to be dealt with below.

An expert witness for plaintiffs testified that, on the basis of his observation of heat treated and untreated lenses which failed on the drop ball test, he was of the opinion, assuming that the lens here involved had been heat treated and further assuming that the lens was in excess of two mm. center thickness, that the lens had been improperly heat treated.

The plaintiffs' claims were submitted on a strict liability theory, as to American Optical that the lens was defective when manufactured and as to the Caldwell defendants, defective when sold, "and thereby dangerous when put to a use reasonably anticipated."

The jury's verdict was against plaintiffs and in favor of all defendants. After their motion for new trial was overruled, plaintiffs appealed.

On this appeal, appellants first contend that the trial court erred in permitting counsel for Caldwells, in closing argument, to refer to portions of the manual for the heat-treating unit which appellants contend were not in evidence and, further, to misstate the content of the manual.

Plaintiffs called as their witness, Frank M. Novosel, bench foreman for C. C. Caldwell Opticians, in November, 1968, and the employee of Caldwell whose responsibility included supervision of the heat treating process. Pursuant to subpoena, Novosel brought with him the Precision Cosmet Manual, entitled "Operation and Care of the Precision Hardening Unit." It was marked for identification as plaintiffs' Exhibit 14 and identified by Novosel as the manual used in November, 1968, in the heat treating process. Plaintiffs' counsel then offered the entire 11-page manual in evidence. Counsel for Caldwell objected to the offer of the entire manual because it contained irrelevant matters. Counsel for plaintiff stated: "If the Court please, I will limit it at this time to identification with specific offers." Counsel for plaintiffs then asked the witness about the first page of the manual which was a photograph of the lens hardening unit and the drop ball tester. The witness testified that such equipment was in use at Caldwell in November, 1968. Thereupon plaintiffs' counsel stated: "I will at this time offer the first page which contains the photograph identified as the Precision Co[s]met machine and the dropball tester in evidence." Counsel for Caldwell stated that he had "no objection to the photograph." Counsel for American Optical stated he had no objection. At this point the transcript on appeal recites:

"PLAINTIFFS' EXHIBIT NO. 14 WAS RECEIVED IN EVIDENCE."

In subsequent interrogation of the witness plaintiffs' counsel inquired:

"Have you read plaintiffs' Exhibit 14, which is the Precision Cosmet Manual?"

The witness stated he had, whereupon plaintiffs' counsel inquired about a statement on page four of the manual, dealing with checking heat-treated lenses with a "polariscope." (Such check shows a maltese cross pattern in the treated lens.) The manual states: "Pattern does not necessarily guarantee a perfectly hardened lens so for a position check lenses should be dropball tested."

No further direct reference to Exhibit No. 14 appears until the objected-to reference by Caldwells' counsel in his closing argument. The significance of that reference requires some detail as to the issue concerning which it was used.

In the interrogation of plaintiffs' expert witness, Bowles, plaintiffs' counsel asked him whether or not a lens needed to be a certain thickness to accept the heat treat-

ment process. An objection was made that the witness had not been shown to be qualified with respect to such question. In response to the trial court's suggestion that some further qualification of the witness with respect to the manufacturing of lenses might be in order, plaintiffs' counsel stated:

" * * * We are talking about heat-treatment process at this point and I an merely going to establish for (sic) this witness on this question that the thicker [the] lens is the better it is going to be. It is going to accept the heat-treating process. If you get a lens too thin it cannot handle the heat-treatment process which our lens is not one that is too thin. There is no problem on that as far as that is concerned, but it is part of the physics of heat-treatment that he is talking about."

Subsequently, the witness, in response to plaintiffs' counsel's question, read from the Prescription Requirements of standards, Z80.1–1964, above quoted.

In his question to the witness which elicited the statement of his opinion that the left lens of Scott's spectacles was not properly heat treated, plaintiffs' counsel included the following hypothesis:

"You may further assume that the left lens met the minimum requirements by the Z80.1 standard, that to-wit, it was in excess of two millimeter center thickness."

In the cross-examination of witness Novosel, Caldwells' counsel asked:

"You have mentioned two or three times as we have been talking here, you and Mr. Vanet have been talking here about a thickness of two millimeters and sometimes you just said a minimum of two millimeters thick and sometimes you said a minimum of two millimeters center thickness, the requirement for being able to heat-treat it as I understand, was that it, be a minimum of two millimeter center thickness, right?"

The witness responded affirmatively.

Lee Bonner, the employee who received the order for the first spectacles and delivered them to Mrs. Kopp, testified in re-

sponse to a question from Caldwells' counsel that a heat-treated lens had to have a thickness of two millimeters.

The final witness, called in the fourth day of the trial and in the defendants' case, was Neill Brandt, a research physicist employed by American Optical. He testified at considerable length about the theory of heat treatment of spectacle lenses and about "Griffith flaws," invisible defects in glass which reduce its theoretical strength. In examining the witness Caldwells' counsel referred to dress-safety lens as one "with a center thickness in excess of minimum center thickness of two millimeters * * *."

Cross-examination of the witness by plaintiffs' counsel extended into the fifth day of trial. Near the end of extensive cross-examination the witness was asked the minimum thickness required by Z80.1 for the center of a plus lens. The witness responded by reading the requirement of the standard—"minimum thickness 2.0 millimeters." The witness stated that he was not aware of any requirement of a minimum thickness at the center and outer edge of the lens. He was then handed the unbroken lens from Scott's spectacle and asked to measure its thickness. The witness measured a center thickness of 2.8 millimeters and a minimum outer edge thickness of 1.5 millimeters.

In the opening portion of his final argument, plaintiffs' counsel stated:

"Now there are several facts in this case that are not in dispute. In the opening statement it sounded like some of them were and some of the inferences are in dispute but some are not in dispute. One fact not in dispute is the thickness of the lens and the standard in the community. Time and time again you heard the requirement by the Z80.1 standard, that was the minimum, the minimum standard in the industry as being two millimeter thickness, minimum thickness of a lens that can be heat-treated.

"I saved for the very last to bring out to the jury the edge thickness of that lens.

The first expert said it was 1.8, that was the smallest, then I asked him if he would recheck it a little closer to the edge and it turned up 1.5.

"There has been substantial testimony in this case from all the experts and others that you cannot effectively heat-treat a lens less than two millimeter thickness. That is one factor that in and of itself and nothing else in this lawsuit is a defect, it's sold as a heat-treated lens. However, it was sold shatter-proof, heat-treated, whatever it was sold as a tempered lens. That is beyond doubt and you cannot effectively temper a lens that is 1.5 thick, and that is not in dispute.

"MR. MULLEN: I object to that. That is not the evidence in the case at all.

"THE COURT: Overruled."

In his closing argument, Mr. Mullen, counsel for Caldwells, stated:

"* * * He says, 'Why the lenses were too thin.' You remember Mr. Novosel was on the stand and he was examining him about it and he says, 'A minimum center thickness of two millimeters.' The evidence is these were 2.8 in the center and I believe the measurement, the man made this morning was 1.5 millimeters on the edge. That gives you an average of 2.15 millimeters thickness and the book on the lens hardening procedure says you add the thickest and the thinnest part and take the average and the time chart shows hardening of thicknesses all the way from 1.8 millimeters up to—

"(Counsel approached the bench and the following proceedings were had:)

"MR. VANET: If the Court please, I object to that testimony being argued to the jury on the basis it is not in evidence. It is outside the evidence. That exhibit has been identified and certain parts of that have been read into evidence. That exhibit is not in evidence and it is not evidence in this case. It is improper and I ask the Court to advise the jury to disregard that testimony and also ask for a mistrial.

"THE COURT: What is the number on that?

"MR. MULLEN: Exhibit No. 14, Your Honor.

"MR. VANET: Mr. Mullen insisted the whole thing not be put in evidence.

"THE COURT: This was marked and everybody used it, but I think in view of your argument and your interrogation that it would be prejudicial not to permit it, Mr. Vanet. I think it is before the jury for all practical purposes.

"MR. VANET: I ask for a mistrial.

"THE COURT: That is denied.

"(The proceedings returned to open court.)

"THE COURT: Proceed.

"MR. MULLEN: All right, sir.

"The average of that lens, Ladies and Gentlemen, 1.5 to 2.8, the average thickness is 2.15 millimeters thick and the instructions show you can harden from all the way 1.8 millimeter thick on up."

After the jury retired to deliberate, the following occurred:

"THE COURT: Let the record show that the jury has requested by writing down on a sheet of paper that was given to them by the bailiff these exhibits, Z80.1, standard 1964 manual which was Plaintiffs' Exhibit 5 and the Kosmet instruction manual which I understood is Plaintiffs' Exhibit 14. Is there any objection to sending those to the jury room?

"MR. VANET: I object sending them to the jury room, number one, neither one of them is in evidence, parts have been read from both, and there is all kinds of material in there not related to the case, and maybe relating to the case but not put in evidence.

"MR. MULLEN: I join in the objection.

"MR. VAN DYKE: And I join in the objection.

"THE COURT: All parties joining, the objections are sustained.

"Here is what I have done. I have written on this page, "The jury will have to remember the evidence as it came in and

the two requested documents are not in evidence." Is that agreeable with the plaintiffs?

"MR. VANET: That is agreeable with the plaintiffs.

"MR. VAN DYKE: That is agreeable with me.

"MR. MULLEN: Well, I don't agree that they are not in evidence, Judge. There are portions of them which are not in evidence.

"THE COURT: I thought that was the basis of the objections you fellows are making.

"MR. VANET: The record shows they are not in evidence. You are the one objecting to it.

"MR. MULLEN: I join in objecting to sending them to the jury room. I didn't agree they were in evidence. There are portions of both that are in evidence but the vast majority of both has not been read to the jury and referred to.

"THE COURT: Frankly, all of you, this is on the record, the way this case was tried and the way you handled these exhibits I think it is frankly a gross miscarriage of justice not to send these exhibits to the jury room. You all took advantage of everything you took out of these documents and the jury has a legitimate inquiry here, it is my view. But because everybody joins in the objection, I am not going to put myself in a position of counsel. I am going to send this up, the jury will have to remember the evidence as it came in and the two requested documents are not in evidence.

"MR. MULLEN: I object to the Court instructing that the documents are not in evidence as if no part of them were not in evidence because of the objection which counsel made during argument.

"THE COURT: Overruled."

Point I of Appellants' brief is:

"The Trial Court erred in permitting counsel for Caldwell Respondents to inject a false issue not in evidence into the case in his closing argument when he argued to the jury that the minimum thickness is calculated by averaging the center thickness and the edge thickness of the lens and in permitting further erroneous conduct of counsel in referring to Appellants' Exhibit 14 (the manual for the lens heat-treating unit) which was not in evidence and misstating to the jury the contents of the manual, and further in not advising the jury to disregard such argument and in failing to declare a mistrial."

Counsel for Caldwells acknowledged that he "hurriedly looked at the time chart in Exhibit 14 and unfortunately misinterpreted it." He in fact did so. The chart to which he referred did not purport to fix the thickness of lenses which might be subjected to heat treatment. It merely fixed the time which lenses of varying thickness should be subjected to heat. It in fact contained no reference whatsoever to a lens with a minimum thickness of 1.5 millimeters.

"A statement by counsel in argument of facts not in evidence or a misstatement of the evidence is generally regarded as reversible error, * * *." 75 Am.Jur.2d Trial, § 258, pp. 335–336 (1974). The manual from which Caldwells' counsel purported to argue had not been placed in evidence in its entirety. In fact, the objection of the attorney who now argues that it was in evidence is what prevented its introduction in entirety. As a result of such objection, plaintiffs' counsel offered only specified portions of the manual using the number given the exhibit for identification purposes. At no time did counsel for either defendant offer the entire document in evidence. There were two specific offers by plaintiffs from the document and that was all the use which plaintiffs made of it. The reporter's statement, "PLAINTIFFS' EXHIBIT No. 14 WAS RECEIVED IN EVIDENCE," must be considered in the light of the offer by plaintiffs' counsel, limited to the first page of the exhibit. That is the offer which the court accepted and the reporter's formal statement for the record cannot enlarge the offer.

The case differs from those cited and relied upon by Caldwells in support of their argument that the entire document was in evidence. Caldwells rely upon cases in which it has been held that where both parties treat documentary evidence as if it had been placed in evidence, the failure to place the document itself in evidence does not make the use in evidence of excerpts from its contents error. *Baker v. Atkins,* 258 S.W.2d 16, 21[11, 12] (Mo.App.1953); *Charles v. Patch,* 87 Mo. 450 (1885); *In re Estate of Layne,* 403 S.W.2d 242, 245[3, 4] (Mo.App.1966); *City of St. Louis v. McCully Const. Co.,* 184 S.W. 939 (Mo.App.1916), and *Wolfe v. Knights and Ladies of Honor, Supreme Lodge,* 160 Mo. 675, 61 S.W. 637 (1901), are cases of this nature. Here, a document was involved, only express parts of which were placed in evidence, and counsel who sought to make use of other parts failed to offer them in evidence and in fact by his objection prevented the reception of the entire document.

Respondents Caldwell also argue that plaintiffs abandoned the issue of a defect based upon the insufficient thickness of the lens. In support of this contention they point to the statement to the court by plaintiffs' counsel, above quoted: "Our lens is not one that is too thin. There is no problem on that as far as that is concerned." They also point to the fact that, in this hypothetical question to his witness Bowles, plaintiffs' counsel's question assumed that the lens met Z80.1 standards in that it "was in excess of 2 mm. center thickness."

When plaintiffs' counsel asked the witness to measure the thickness of the right lens, there was no objection that any claim on that basis had been abandoned. Nor was such objection raised when plaintiffs' counsel argued the issue to the jury. At the trial Caldwell counsel obviously considered the issue in the case when he sought to answer it by a misstatement of the content of the manual.

Caldwell counsel now argues that he failed to produce evidence as to the meaning of the Z80.1 standard with respect to

thickness because he considered that plaintiffs had abandoned the issue. However, the record discloses that no such position was advanced in the trial court. Counsel did interrogate his witness Novosel on the minimum thickness required for heat treatment and in his argument referred to Novosel's testimony that a minimum center thickness of 2 mm. was required.

■ Inasmuch as in the conduct of the trial, there was no evidence that Caldwell counsel considered that the issue of minimum thickness had been abandoned, his erroneous reference to the content of the manual cannot be dismissed as harmless error.

Likewise, Caldwells' contention that the error was harmless because invited by plaintiffs' counsel's injection of an abandoned issue into the case is without merit. This was not a case of invited error. The issue was properly in the case and plaintiffs' counsel's argument of it on the basis of the evidence in the case did not entitle Caldwell counsel to go beyond the evidence in response.

The prejudicial nature of the action of the Caldwell attorney is obvious. The trial court should have sustained the plaintiffs' objection to the use of the manual by Caldwell counsel to refer to matters not placed in evidence. The error was compounded when counsel erroneously stated the content of the manual. No objection on that ground was made in the trial court but a correct ruling on the original objection would have avoided the problem. This is an error which requires reversal of the judgment in favor of Caldwells unless, as they contend, no submissible case was made as to them. That question will now be considered, along with the contention of American Optical that no submissible case was made as to it.

■ Plaintiffs did present evidence of a defect in the lens which broke, resulting in injury to Scott. Their expert testified that, in his opinion, the lens had been improperly heat treated. Caldwells have not here at-

tacked the admissibility of such opinion evidence. There was also evidence from which it might have been found that the lens was defective because it failed to meet minimum standards of thickness for heat treatment. As Caldwells argue, there was no direct evidence of the thickness of the lens which broke. However, there was evidence concerning the companion lens and other evidence from which it might have been inferred that the broken lens was of a similar thickness.

Caldwells argue that plaintiffs' evidence failed to make out any causal connection between the alleged defects and the injury sustained. They argue that no one for plaintiffs ever asked and no one for Caldwells ever represented that the lens would withstand being hit by a rock in a rock fight. They argue that the legal cause of the injury was the action of the Keirstead boy in throwing the rock which struck the lens.

The evidence made a submissible case as to whether or not Scott's injury was the direct result of the allegedly defective condition of the lens. The object of heat treatment was to reduce the danger from slivers when a lens fractured. A jury could find from the evidence here that the lens, when used in a reasonably to be anticipated manner, failed to fulfill its purpose because of defects which might have been found to exist.

■ As to American Optical, however, the situation is different. The charge there is that the lens was defective when manufactured. There is considerable doubt that the evidence was sufficient to show that the lens was manufactured by American. It is, however, not necessary to pursue that issue because the evidence is wholly lacking as to the condition of the lens when American completed its manufacturing process. Plaintiffs' expert testified that the defect which he found was in the heat treatment process which was not done by American. Even as to the thickness of the lens, there was no evidence that American represented that this lens was one which might be sub-

jected to heat treatment. Absent such evidence, there could be no finding of defective manufacture on this score. The evidence failed to make a case of liability on the part of American Optical and the judgment in its favor must be affirmed without the necessity of considering the allegation of trial error as to it.

As to Caldwells, however, the judgment must be reversed because of the error above discussed. Because the problem will undoubtedly recur on a retrial, consideration will be given to the contention regarding the application of the Dead Man's Statute to testimony of Mrs. Kopp regarding conversation with Caldwell dispenser Zajic who was dead at the time of the trial.

■ The trial court properly excluded Mrs. Kopp's testimony. She was a party to the contractual arrangement concerning which she sought to testify. Zajic, the deceased, was the agent of the other party. His death, under § 491.010, disqualified Mrs. Kopp from testifying to the conversations with him. *Freeman v. Berberich,* 332 Mo. 831, 60 S.W.2d 393, 397[6] (1933); *State ex rel. State Highway Comm. v. Jacobs,* 281 S.W.2d 597, 598–599[1] (Mo.App.1955); *Pelligreen v. Century Furniture & Appliance Co.,* 524 S.W.2d 168, 170[1–7] (Mo.App. 1975).

This is not a case of agent of one party testifying to dealings with the deceased agent of the other party as was the situation in *J. E. Blank, Inc. v. Lennox Land Co.,* 351 Mo. 932, 174 S.W.2d 862 (banc 1943), cited and relied upon by appellants. Mrs. Kopp was the surviving party to the contract for purchase of the spectacles. She was not an agent for her son who as a minor could not appoint an agent. *Bell v. Green,* 423 S.W.2d 724, 730[4–9] (Mo. banc 1968). The court properly rejected an offer of proof that Mrs. Kopp's testimony be admitted only in favor of her son. He, insofar as his claim involved representation made to his mother, was in the position of "claiming under" his mother as the actual party to the contract. § 491.010, RSMo 1969.

Mrs. Kopp's testimony would have related to contractual dealings with the agent

authorized to transact the sale of lenses on behalf of Caldwell. This case does not fall within the holding of *Freeman v. Berberich,* supra, permitting the party injured by the tortious conduct of a servant, since deceased, to testify to the servant's acts in a cause of action against the master.

■ Inasmuch as Zajic's death occurred after Mrs. Kopp's deposition had been taken, the taking of the deposition did not amount to a waiver of her disability to testify to her conversation with Zajic. *DeMott v. Dillingham,* 512 S.W.2d 918, 920[1–3] (Mo.App.1974).

■ Appellants' contention of error based upon the trial court's giving one converse instruction on behalf of Caldwells against all claims of plaintiffs is without merit. The instruction conversed only the elements common to plaintiffs' four verdict-directing instructions. Therefore, the use of a single converse was correct. *Murphy v. Land,* 420 S.W.2d 505, 507[2] (Mo.1967); *Watterson v. Portas,* 466 S.W.2d 129, 131–132[4] (Mo.App.1971). The instruction did not purport to converse the issue of damages, as was the case in *Wyatt v. Southwestern Bell Telephone Company,* 514 S.W.2d 366 (Mo.App.1974), and *Burrow v. Moyer,* 519 S.W.2d 568 (Mo.App.1975). (Inasmuch as the conclusion has already been reached that no submissible case was made against American Optical, there is no occasion to reach the appellants' contention of error as to it in the submission of multiple converse instructions.)

Judgment affirmed as to American Optical Corporation. Judgment reversed as to C. C. Caldwell Opticians, Inc. and C. C. Caldwell Optical Company, and cause remanded for a new trial as to them.

All concur.