**Joseph POWDERLY and Alice Powderly, Plaintiff/Appellant,**

v.

**SOUTH COUNTY ANESTHESIA ASSOCIATES, LTD. and George Romkema, M.D., Defendant/Respondent.**

No. ED 88273.

Missouri Court of Appeals, Eastern District, Division Two.

Feb. 13, 2008.

**270**

James Peter Leonard, Gonzalo Andres Fernandez, Devereaux, Stokes, Nolan, Fernandez & Leonard, P.C., St. Louis, MO, for appellant.

Gregory J. Minana, Mark G. Arnold, Sarah C. Hellmann, Husch & Eppenberger, LLC, St. Louis, MO, for respondent.

Before LAWRENCE E. MOONEY, P.J., BOOKER T. SHAW, J., and KURT S. ODENWALD, J.

KURT S. ODENWALD, Judge.

*Introduction*

Joseph Powderly (Patient) and Alice Powderly (Wife) (collectively referred to as Plaintiffs) appeal from the trial court's judgment, entered in accordance with a jury verdict, in favor of defendants George Romkema, M.D. (Anesthesiologist) and South County Anesthesia Associates, Ltd. (Anesthesia Company) (collectively re-

ferred to as Defendants) in Plaintiffs' medical malpractice action. We affirm.

*Factual and Procedural Background*

On November 20, 2000, Patient underwent microscopic brain surgery to repair an aneurysm on an artery in his brain. Faisal Albanna, M.D. was Patient's surgeon. Anesthesiologist assisted as the anesthesiologist during the surgery. During the procedure, Dr. Albanna exposed the aneurysm and attempted to clip it. He experienced difficulty and placed "temporary clips" or cross clamps on the middle cerebral artery. The temporary clipping closed off Patient's middle cerebral artery and remained in place for approximately 55 minutes. During this procedure, Anesthesiologist gave Patient six different medications to lower Patient's blood pressure. Thereafter, Patient suffered an ischemic stroke and injury to the right side of his brain.

Patient and Wife filed this medical negligence action against Albanna Neurosurgical Consultants and Scott Radiology Group, Inc. on August 15, 2002. Plaintiffs dismissed without prejudice their claim against Scott Radiology Group, Inc. on July 20, 2003. On October 12, 2004, Plaintiffs filed their First Amended Petition against the original defendants, also adding defendants South County Anesthesia Associates, Ltd. and George Romkema, M.D.

Plaintiffs voluntarily dismissed Scott Radiology Group on September 23, 2005. Plaintiffs subsequently reached a settlement agreement with defendant Albanna Neurological Consultants and dismissed that defendant with prejudice from the suit.

On March 6, 2006, the case proceeded to trial against the remaining defendants, Anesthesia Company and Anesthesiologist. The jury returned a verdict on March 15,

2006, in favor of Anesthesia Company and Anesthesiologist. The jury assessed 0% fault to Defendants and 100% fault to Dr. Albanna. Plaintiffs filed this appeal.

### Points on Appeal

Plaintiffs raise two points on appeal. In Point I, Plaintiffs claim that the trial court erred in overruling Plaintiffs' objection and allowing Defendants to play 40 minutes of the videotaped brain surgery throughout Defendants' closing argument because the use of the videotape constituted improper reference to matters not placed in evidence and was designed to inflame and mislead the jury.

In Point II, Plaintiffs argue that the trial court erred in overruling Plaintiffs' timely objection and giving Jury Instruction No. 7 regarding Dr. Albanna's fault. Plaintiffs assert that the third disjunctive submission of negligence of Jury Instruction No. 7 was not supported by the evidence because no expert testimony was offered to show that Patient's surgery was performed without an optimal magnetic resonance imaging, or MRI.

We will review each of these points and their relevant facts separately.

### POINT I

#### Factual Background on Point I

During a pre-trial conference on March 3, 2005, and within a discussion regarding business records stipulations, Plaintiffs' counsel stated that Patient's brain surgery was videotaped. He explained that Plaintiffs intended to show portions of the intraoperative videotape as an exhibit while an expert explained the contents of the video. When the trial court asked whether Defendants had an objection, defense counsel answered, "I may have an objection to that. I was stipulating to the foundation on the videotape, that it's a medical record. I think my objection on how they're going to use it would depend on how they're planning on using it. That's the first I've heard of this, and I may have an objection to that."

In response to defense counsel's concerns, Plaintiffs' counsel explained that Plaintiffs intended to show the video because one of the significant issues in the case was the amount of time that the cerebral artery clamps remained in place on the middle cerebral artery. The videotape depicted the clamps going on and the clamps coming off, and the accurate duration of the clamping procedure. Plaintiffs' neurosurgeon would explain the clamping procedure to the jury while the video played.

When the trial court asked Defendants what their objection would be, defense counsel stated, "As they've characterized it, I don't know that I would have an objection. It's not overly gruesome or anything like that. And so—"

The trial court asked Plaintiffs whether they would show the whole surgery, and Plaintiffs' counsel answered, "We'd be here a long time."

Plaintiffs' counsel also stated that, after meeting with their video technician that afternoon, they would be able to share with Defendants exactly which portions of the video they would use during the trial.

During trial, Plaintiffs played portions of the videotape during the testimony of their expert witness Dr. John Seelig. Plaintiffs also showed portions of this exhibit during the testimony of Carmon Wilson, the physician's assistant who had participated in the procedure. Additionally, Defendants played portions of the videotape during the testimony of their neurosurgical expert Dr. Michael Chicoine.

Prior to closing arguments, both Plaintiffs and Defendants offered into evidence

their copies of the videotape that had been used without objection by both Plaintiffs and Defendants during trial. Both exhibits were "admitted into evidence" by the trial court without objection from any party.

During closing arguments, Defendants played the videotape for approximately 40 minutes while delivering their closing remarks. Defendants periodically referred to the videotape, stating, "It's still bleeding," to reiterate what their expert Dr. Chicoine had already testified to—that the continuous bleeding throughout the operation created a life-threatening situation. Plaintiffs objected to Defendants' continuous running of the videotape during closing arguments as going beyond the evidence because the jury was being shown more of the video than the selected video clips played to the jury during testimony. The court overruled the objection but cautioned Defendants to run the tape at their own risk because it was distracting.

The trial court denied Plaintiffs' Motion for a New Trial, which claimed that the trial court erred in allowing Defendants to play the entire videotape during closing argument. Plaintiffs alleged that playing the videotape in its entirety by Defendants improperly allowed Defendants to place evidence before the jury that was not shown to the jury during the evidence segment of the trial, and which was not admitted into evidence. Plaintiffs claimed that this use of the videotape was prejudicial to the Plaintiffs.

### Standard of Review

■ This Court reviews a trial court's ruling in closing argument for an abuse of discretion. *Nelson v. Waxman*, 9 S.W.3d 601, 606 (Mo. banc 2000). A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before it and is so un-

reasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration. *Miller v. SSM Health Care Corp.*, 193 S.W.3d 416, 421 (Mo.App. E.D.2006). Counsel is traditionally given wide latitude to suggest inferences, even though illogical or erroneous, from the evidence during closing argument. *Nelson*, 9 S.W.3d at 606. When reviewing closing argument, we must consider the argument in light of the entire record and should only reverse if the challenged comments were clearly unwarranted and injurious to the other party. *Burrows v. Union Pacific R. Co.*, 218 S.W.3d 527, 534 (Mo.App. E.D.2007).

### Legal Discussion on Point I

■ Plaintiffs' first point on appeal asserts that Defendants placed before the jury facts and portions of an exhibit that were not admitted into evidence. Plaintiffs argue that a similar attempt was rejected in *Kopp v. CC Caldwell Optical Co.*, 547 S.W.2d 872 (Mo.Ct.App.1977). While Plaintiffs are correct that *Kopp* held the trial court erred by allowing counsel to refer to portions of an operations manual that had not been placed in evidence, *Kopp* also made clear that the whole manual from which counsel purported to argue had not been placed in evidence. As a result of specific objections made during trial, only the first page of the manual was offered into evidence. *Id.* at 875. Other portions of the manual were read, but were not offered or admitted into evidence. *Id.* at 877. Consequently, Plaintiffs' reliance on *Kopp* is misplaced because here, unlike the situation in *Kopp*, the entire videotape at issue in this appeal was admitted into evidence at trial.

■ Moreover, the holding in *Kopp* does not stand for the proposition that a videotape admitted into evidence in its entirety without objection should be excluded

from closing arguments because only excerpts of the videotape were played or otherwise used during testimony, or that the use of the videotape with the jury is limited to only those portions utilized during testimony. When evidence of one of the issues in the case is admitted without objection, the party against whom it is offered waives any objection to the evidence, and it may be properly considered even if the evidence would have been excluded upon a proper objection. *Reinert v. Dir. of Revenue*, 894 S.W.2d 162, 164 (Mo. banc 1995). Once a court has admitted evidence, that evidence should be made available to the jury on an equal basis with all other evidence in the case. *Freeman v. Kansas City Power & Light Co.*, 502 S.W.2d 277, 282 (Mo.1973); *Cox v. Blackwell*, 661 S.W.2d 831, 833 (Mo.App. S.D. 1983). Additionally, a trial court commits no error by permitting counsel to review admissible evidence in argument before the jury after the evidence is in the record. *State v. Haslar*, 887 S.W.2d 610, 617 (Mo. App. W.D.1994). "A party is entitled to argue all the evidence presented for the determination by the jury." *Whisenand v. McCord*, 996 S.W.2d 528, 531 (Mo.App. W.D.1999).

■■■ Upon review of the record, we conclude the parties' pre-trial discussion regarding the use of the videotape during expert testimony did not rise to the level of a stipulation or an objection that may have restricted admission of the videotape into evidence. The record is clear that both parties offered the entire videotape into evidence without reference to any limitations. Neither party objected to its admission or suggested any limitation on the videotape's admission into evidence. The trial court admitted the entire videotape and thus, the videotape was evidence in the record available in its entirety to the jury.[1] The trial court did not abuse its discretion in permitting counsel to review the admissible evidence in closing argument. The trial court did not err in overruling Plaintiffs' objection and allowing Defendants to play the videotape throughout Defendants' closing argument. As to Defendants' references to the bleeding displayed in the videotape, we conclude these remarks fell within counsel's wide latitude of suggesting inferences or referring to the evidence because evidence of Patient's bleeding was admitted when Defendants' expert, Dr. Chicoine, testified as to the significance of the bleeding.

Plaintiffs' first point is denied.

## POINT II

### Factual Background on Point II

During the trial, Plaintiffs' expert, Dr. Seelig, was critical of Dr. Albanna for pro-

---

1. Plaintiffs suggest that the customary practice in the trial of medical negligence cases is the joint introduction of voluminous hospital charts and medical records, select portions of which are separately marked and offered into evidence by the parties as the selected portions are used during the testimony of witnesses. While the challenges posed to trial counsel in presenting relevant evidence when dealing with voluminous documents may very well lead to such a custom and practice in cases of medical negligence, any such custom and practice would not supersede the clearly established principles allowing the use of all admitted evidence by counsel in their argu-

ments before a jury once the evidence is in the record. Moreover, it is not for this Court to determine the intent of the parties' counsel regarding the use of exhibits and documents at trial. Any limitation on the use of voluminous documents, medical or otherwise, could have been addressed through a written stipulation by the parties or an objection raised before the trial court at the time the evidence was offered for admission. Absent an express stipulation by the parties as to the use of documents or other evidence, the lack of an objection at the time the evidence is offered for admission allows the full use of such evidence by any party.

ceeding to surgery despite suboptimal presurgical testing. Plaintiffs' counsel first asked, "Before you saw—without looking at the videotape, I want to know based upon your review of the records, do you have some criticisms of Dr. Albanna based upon this note?" Dr. Seelig responded, "Yes."

Plaintiffs' counsel then asked, "Do you remember what—well let's go through your criticisms. Probably easier that way, and quicker. Were you critical with regard to the speed with which the operation—well, that's a bad word. Were you critical about what was done before the operation started in the sense of was it a good idea to start?"

The witness responded affirmatively again and Plaintiffs' counsel asked, "And what were you critical about with regard to the timing of the surgery?" The following exchange then occurred:

[Dr. Seelig]: Most definitely the suboptimal angiogram.

[Plaintiffs' counsel]: And why? What's the problem?

[Dr. Seelig]: Well, the definition of the anatomy is critical for these operations so that you know what to do and how to prepare. This may be a case that you need to prepare for a bypass and then trap the aneurysm. You don't know. So it's suboptimal and he said it was suboptimal. That's No. 1.

[Plaintiffs' counsel]: So they should have done more films?

[Dr. Seelig]: They should have done conventional carotid angiography with different varying views and subtraction, enhancement, etcetera.

[Plaintiffs' counsel]: Did you have some criticism of Dr. Albanna based upon the—

[Dr. Seelig]: And let me say one other thing.

[Plaintiffs' counsel]: Sure.

[Dr. Seelig]: And an MRA. It was even suggested by the radiologist who did the MRI let's look at the MRA because we can't tell if it's one or two aneurysms. It's there in the record in the MRI, and that's very important.

[Plaintiffs' counsel]: Okay. Were you—

[Dr. Seelig]: Before you do the angiogram.

During trial, Defendants presented evidence regarding whether Anesthesiologist was negligent in his treatment of Patient. Defendants' expert Dr. William Owens, a board certified anesthesiologist and professor at Washington University Medical School, testified with a reasonable degree of medical certainty that, in his opinion, Anesthesiologist did not deviate from the standard of care in providing anesthesia to Patient. Dr. Owens testified that during a neurosurgical procedure such as a brain aneurysm repair, the surgeon primarily decides at what level the patient's blood pressure should be. Additionally, Defendants' expert Dr. Chicoine, a board certified neurosurgeon and assistant professor at Washington University Medical School, testified that, in his opinion, Anesthesiologist was not negligent given the circumstances of Patient's procedure.

During the instruction conference, Plaintiffs submitted their proposed verdict director against the Defendants in Instruction No. 6, which stated as follows:

In your verdict, you must assess a percentage of fault to Defendants Dr. Romkema and South County Anesthesia Associates if you believe:

First, Defendant Dr. Romkema either:

lowered Joseph Powderly's blood pressure into the 50–60 mean arterial pressure range for more than thirty minutes while the middle ce-

rebral artery was temporarily clipped,

or

failed to monitor the length of time the temporary clips remained on Joseph Powderly's middle cerebral artery, or failed to discuss the use of temporary clips with Dr. Albanna immediately before and during the surgery, and

Second, Defendant Dr. Romkema, was thereby negligent, and

Third, such negligence directly caused or directly contributed to

cause damage to Joseph Powderly, and

Fourth, Defendant Dr. Romkema had actual knowledge that Joseph

Powderly had suffered a brain injury and that his negligence had contributed to cause that injury, and

Fifth, Defendant Dr. Romkema made representations about Joseph

Powderly's brain injury and the causes thereof by, either:

omitting the time of temporary clip placement and removal from the anesthesia record, or

omitting his observation that Joseph Powderly had no response on the left side at 1:30 pm on November 20, 2000, or

his statements to Alice Powderly on November 21, 2000 that caused her to believe there were no serious complications and her husband would get better, and

Sixth, those representations were false, and

Seventh, Defendant Dr. Romkema, by such omissions or

statements, intended to conceal from Plaintiffs that they had a claim against Defendants for Joseph Powderly's injuries, and

Eighth, using reasonable diligence, Plaintiffs could not have

discovered the existence of their claims against Defendants until the videotape of the surgery was produced to them in June, 2004.

Defendants submitted Instruction No. 7 to address the issue of Dr. Albanna's comparative fault. Instruction No. 7 stated as follows:

In your verdict you must assess a percentage of fault to Faisal Albanna, M.D., whether or not George Romkema, M.D. was partly at fault, if you believe:

First, Faisal Albanna, M.D. either

failed to monitor the length of time the temporary clips remained on plaintiff Joseph Powderly's middle cerebral artery, or

instructed defendant George Romkema, M.D. to lower plaintiff Joseph Powderly's blood pressure into the 50–60 mean arterial pressure range for more than thirty minutes while the middle cerebral artery was temporarily clipped;

or

performed surgery without an optimal MRI; and

Second, Faisal Albanna, M.D., in any one or more of the respects submitted in paragraph First, was thereby negligent; and

Third, such negligence directly caused or directly contributed to cause damage to plaintiff Joseph Powderly.

During the instruction conference, Plaintiffs objected to Instruction No. 7 on grounds that the evidence did not support all three of the disjunctive submissions of negligence. Plaintiffs' counsel stated, "There's no evidence that the Doctor—the plaintiff does not believe that there is evi-

dence to support the second and third elements, ordered/instructed him to do it and perform the surgery with a suboptimal MRI. I don't think there was any evidence that the lack of an optimal MRI contributed to cause the injuries." When given the opportunity to respond to the objection, Defendant declined to respond. The trial court noted and overruled the objection.

When defense counsel presented his closing argument, he addressed Instruction 7 in his remarks. He stated, "You can also, if you choose, believe that Dr. Albanna is at fault, that he did not appropriately—he did not know what this aneurysm was all about, didn't have a good enough MRI, that he cut it before he had it all under control, before he had everything clipped, and he allowed this bleeding to occur. You can do that as well".

"But what you cannot do is you cannot assess liability to [Anesthesiologist] for things that Dr. Albanna was doing. The Judge read the instructions."

Defense counsel again mentioned the MRI in his closing argument when he explained, "Now, if you believe Dr. Albanna, I guess you could give [Anesthesiologist] 20 percent. You can't give him 50 percent. He's still not in charge of the clips. He's still not in charge of the scalpel. He's still not in charge of the microscissors. He still didn't schedule the surgery after a week. He didn't not get a repeat MRI that showed a complex aneurysm. [Anesthesiologist] did none of those things. But in order for you to do anything other than zero for [Anesthesiologist], anything other than zero, you have to believe Dr. Albanna."

Finally, at the end of his closing arguments, defense counsel added, "[Anesthesiologist] did not schedule that surgery. [Anesthesiologist] did not rush to surgery without another MRI that would show the complex nature of the aneurysm. [Anes-thesiologist] didn't have his hands in there with instruments and retractors causing swelling and other damage. [Anesthesiologist] did not use microscissors and puncture that artery when it wasn't under control. [Anesthesiologist] didn't have trouble with the clips. [Anesthesiologist] didn't do any of those things . . . ."

In their appeal, Plaintiffs concede that the first two disjunctive submissions of negligence with regard to Dr. Albanna were supported by Dr. Seelig's testimony. Plaintiffs argue, however, that the third disjunctive submission—that Dr. Albanna performed the surgery without an optimal MRI—was not supported by the evidence.

### Standard of Review

■■■■ This Court reviews a claim of instructional error *de novo*, evaluating whether the instruction was supported by the evidence and the law. *Ploch v. Hamai*, 213 S.W.3d 135, 139 (Mo.App. E.D. 2006) (citing *Marion v. Marcus*, 199 S.W.3d 887, 892 (Mo.App. W.D.2006) (clarifying standard of review)). We review the evidence in the light most favorable to the party submitting the instruction. *Id.* To reverse on grounds of instructional error, the party challenging the instruction must show that the offending instruction misdirected, misled or confused the jury, and prejudice resulted. *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 458 (Mo. banc 2006).

■■■■ An instruction must be supported by substantial evidence. *Romeo v. Jones*, 144 S.W.3d 324, 330 (Mo.App. E.D. 2004). Substantial evidence is evidence which, if true, is probative of the issues and from which the jury can decide the case. *Id.* A party is entitled to an instruction on any theory supported by the evidence. *Id.* "There must be substantial evidence[,] and a mere scintilla of evi-

dence[ ] or speculative deductions and conclusions will not suffice." *Marion*, 199 S.W.3d at 894. In the case of a disjunctive instruction, each submission must be supported by substantial evidence. *Ploch*, 213 S.W.3d at 140. Additionally, a proper instruction submits only the ultimate facts, not evidentiary details, to avoid undue emphasis of certain evidence, confusion, and the danger of favoring one party over another. *Moore v. Bi–State Dev. Agency*, 87 S.W.3d 279, 293 (Mo.App. E.D.2002). We have not fashioned precise, universally applicable definitions to explicitly differentiate evidentiary facts from ultimate facts; rather, we determine the ultimate facts on a case-by case basis. *Id.* The test is whether the instruction follows the substantive law and can be readily understood by the jury. *Id.*

### Legal Discussion on Point II

■ In rebuttal to Plaintiffs' claim that the third disjunctive submission was not supported by the evidence, Defendants first assert that Plaintiffs waived this argument by failing to make it at the instruction conference. Defendants argue that Plaintiffs initially claimed that there was no evidence to support the third disjunctive submission, but limited their "no evidence" objection to causation. Defendants argue that subsequently in this appeal, Plaintiffs no longer limit this objection to causation, and therefore have waived this point. We disagree.

At trial, Plaintiffs' objection to Instruction No. 7 stated: "There's no evidence that the Doctor—the Plaintiff does not believe that there is evidence to support the *second and third elements*, ordered/instructed him to do it and perform the surgery with a suboptimal MRI. I don't think there is any evidence that the lack of

an optimal MRI contributed to cause the injuries." (emphasis added).

Rule 70.03 states in part:

Counsel shall make specific objections to instructions considered erroneous. No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds for the objection.

Rule 70.03 is designed to prevent retrials for instructional error that was not brought to the trial court's attention prior to submission. *Hatch v. V.P. Fair Found., Inc.*, 990 S.W.2d 126, 140 (Mo.App. E.D. 1999). Further, a party is not entitled to argue on appeal a different theory than it presented to the trial court. *Wise v. Sands*, 739 S.W.2d 731, 734 (Mo.App. S.D. 1987). Here, however, Plaintiffs' theory of instructional error both in trial and on appeal remains the same—that the third disjunctive submission in Instruction No. 7 was not supported by the evidence. During the instruction conference, Plaintiffs' objection was that there was no evidence to support the *second and third elements* of the instruction regarding Dr. Albanna's acts. The record before us does not suggest that Plaintiffs' objection addressed the third section of the instruction relating to causation in the abstract without any reference to the lack of evidentiary support. Without further evidence that Plaintiffs' objection emphasized causation rather than "any evidence" or "lack of an optimal MRI," we agree that Plaintiffs preserved the claim of error, and we review Plaintiffs' second point.

■ To refute Plaintiffs' claim that the third disjunctive submission was not supported by the evidence, Defendants assert that Dr. Seelig's testimony explains that the radiological preoperative evaluation—involving both the MRI and the angiogram—was suboptimal and was a breach

of the standard of care. Defendants support this argument with the evidence that Dr. Seelig was critical of the suboptimal radiological testing, which includes an MRI, in addition to magnetic resonance angiography (MRA), used to generate pictures of arteries to evaluate them for aneurysms.

We disagree with Defendants' characterization of Dr. Seelig's testimony. Dr. Seelig testified regarding his opinion of the radiological testing performed prior to surgery, and he indistinguishably referenced an MRI, MRA and angiogram. While Dr. Seelig pointed to the need for the MRA following the MRI, he never testified that the MRI itself was suboptimal. There is no evidence in the record to suggest that a better quality MRI was possible, or would have provided Dr. Albanna with the information he needed to perform the surgery. We find no evidence in the record that the MRI relied upon was suboptimal. Rather, Dr. Seelig's testimony was critical of Dr. Albanna proceeding to surgery without additional angiography and an MRA.

We agree that there was insufficient evidence to support Defendants' claim that Dr. Albanna breached the standard of care required of him as defined under the third disjunctive of Instruction No. 7 as submitted to the jury, i.e., that Dr. Albanna performed surgery without an optimal MRI. Although it is possible that the jury relied upon the improper third disjunctive in determining Dr. Albanna's negligence under Instruction No. 7, this Court has neither the responsibility nor the ability to probe beyond the jury's written verdict in an attempt to discern the basis for their decision. This reality underscores the importance of the requirement that each disjunctive contained within the jury instructions be supported by substantial evidence rather than a mere scintilla of evidence, or speculative deductions or conclusions. *See Marion*, 199 S.W.3d at 894. The trial court erred in submitting Instruction No. 7 to the jury.

■ Although we agree with Plaintiffs' argument that the third disjunctive of Instruction No. 7 was not supported by substantial evidence, we also must agree with Defendants that such error was harmless and did not prejudice the Plaintiff. Defendants posit that any error in the verdict director against the settling co-defendant Dr. Albanna is harmless because the jury found Anesthesiologist 0% negligent in Jury Instruction No. 6. Defendants cite this Court's opinion in *Green v. United Express*, 969 S.W.2d 825 (Mo.App. E.D. 1998) and *Barnes v. Tools & Machinery Builders, Inc.*, 715 S.W.2d 518 (Mo. banc 1986), to support their argument that the court must assume the jury followed each of its instructions, and would have assessed a percentage of fault against Anesthesiologist had it found that the hypotheses in Instruction No. 6 were satisfied, unconditioned on whether Dr. Albanna was negligent.

We find guidance on this issue in *Green*, 969 S.W.2d at 827 (citing *Wilson v. Shanks*, 785 S.W.2d 282, 285 (Mo. banc 1990) and *Barnes*, 715 S.W.2d at 521, as support for its decision), and *Wilson*, 785 S.W.2d at 285 (citing *Lee v. Mirbaha*, 722 S.W.2d 80 (Mo. banc 1986) and *Barnes*, 715 S.W.2d at 518, as support for its decision). In *Wilson*, *Lee* and *Barnes*, the plaintiffs' verdict-directing instructions required the juries to assess a percentage of fault to the defendants if the juries believed certain factual submissions. *Wilson*, 785 S.W.2d at 284; *Lee*, 722 S.W.2d at 82; *Barnes*, 715 S.W.2d at 520. Contributory comparative negligence instructions were submitted by the defendants in these cases requiring the juries to assess a percentage of fault to another party if they believed a different, although not logically inconsistent, set of factual propositions. *Wilson*, 785 S.W.2d at 284; *Lee*, 722

S.W.2d at 83; *Barnes,* 715 S.W.2d at 520. In each of these cases, the Supreme Court held that the jury verdict assessing no fault to the defendant negated any claim of prejudice to the plaintiff in the giving of an erroneous contributory fault instruction. *Lee,* 722 S.W.2d at 84; *Barnes,* 715 S.W.2d at 522. The holdings of these cases were applied by this Court in *Green,* 969 S.W.2d at 827.[2]

As in *Wilson, Lee, Barnes* and *Green,* we must assume here that the jury followed its instructions. There are no facts before us that would cause us to conclude otherwise. This Court is cognizant of the repeated references to the MRI made by defense counsel during closing argument, and the relationship of that portion of defense counsel's closing argument to the third disjunctive of Instruction No. 7. However, defense counsel's studied attempt to focus the jury's attention on Dr. Albanna does not alter the fact that any consideration of Dr. Albanna's alleged negligence by the jury under Instruction No. 7 was separate and distinct from the jury's consideration of Defendants' alleged negligence under Instruction No. 6.

As given by the trial court, Instruction No. 6 required some assessment of fault to the Defendants if the jury found the facts hypothesized to be true. The assessment of fault was not dependant upon and made no reference to Instruction No. 7. The introductory language of Instruction No. 7, "In your verdict you must assess a percentage of fault to Faisal Albanna, M.D., *whether or not George Romkema, M.D. was partly at fault,*" underscores the sepa-rateness of these two instructions (emphasis added). Here, the jury unequivocally returned a verdict in favor of Defendants in response to Instruction No. 6, and the evidence presented by Defendants' witnesses supports such finding. Defendants' expert Dr. Owens testified that Anesthesiologist did not deviate from the standard of care in providing anesthesia to Patient, and that a surgeon primarily decides at what level the patient's blood pressure should be during a neurosurgical procedure such as a brain aneurysm repair. Additionally, Defendants' expert Dr. Chicoine testified that, in his opinion, Anesthesiologist was not negligent given the circumstances of Patient's procedure. The jury necessarily must have concluded that one of the essential propositions was not established when it failed to assess any fault to the Defendants. The absence of any assessment of fault to Defendants negates any claim of prejudice to Plaintiffs in giving the erroneous comparative fault instruction. *Green,* 969 S.W.2d at 827, citing *Wilson,* 785 S.W.2d at 285. Any error in Instruction No. 7 is harmless. The Plaintiff's second point is denied.

### Conclusion

The judgment of the trial court is affirmed.

LAWRENCE E. MOONEY, P.J., and BOOKER T. SHAW, J., Concur.

---

**2.** We recognize that the facts of the case before us seek an assignment of fault against a person no longer a defendant in the lawsuit, which is a distinction from the facts in *Wilson, Barnes, Lee* and *Green.* This factual distinction is not relevant to the issue at hand. Rather, the separateness of the findings required by each instruction is the core issue to be considered. Although Plaintiffs recognize the holdings in each of these cases made by the Supreme Court and this Court, Plaintiffs assert that the courts in *Wilson, Lee* and *Green* each have misapplied *Barnes* due to the unique jury instructions used in *Barnes.* Plaintiffs have presented us with no decisions wherein the Supreme Court has retreated from its holding in *Wilson, Lee* or *Barnes.*