

# In the Missouri Court of Appeals
# Eastern District
## DIVISON FOUR

TANISHA ROSS-PAIGE, )     No. ED101747
)
     Respondent, )
)
vs. )
)     Appeal from the Circuit Court of
SAINT LOUIS METROPOLITAN )     the City of St. Louis
POLICE DEPARTMENT, STEVEN A. )
GORI, MICHAEL A. DEEBA, SR., )
SAINT LOUIS BOARD OF POLICE )
COMMISSIONERS, RICHARD H. GRAY, )     Honorable Timothy J. Wilson
BETTYE BATTLE TURNER, THOMAS )
J. IRWIN and FRANCIS G. SLAY, )
)
     Appellants. )     Filed: June 30, 2015

### *Introduction*

The St. Louis Board of Police Commissioners (Board) appeals the Circuit Court judgment in favor of Tanisha Ross-Paige (Plaintiff) on her claim that the St. Louis Metropolitan Police Department (SLMPD) retaliated against her, in violation of the Missouri Human Rights Act (MHRA), after she filed an internal complaint of sexual harassment and retaliation with the SLMPD. The Board asserts that the trial court erred in: (1) submitting Instruction No. 8 to the jury; and (2) overruling the Board's motion for a new trial on the issue of punitive damages due to juror misconduct. We affirm.

*Factual and Procedural Background*

Plaintiff, a police officer, joined the canine unit of the SLMPD in 2009. In 2011, Sgt. Steven Gori was Plaintiff's immediate supervisor and Lt. Michael Deeba was commander of the SWAT and canine units. Prior to June 2011, Plaintiff received only positive performance reviews.

At the beginning of Plaintiff's shift on June 2, 2011, she responded to a hostage situation with her dog, Duncan. After the scene was secured, Sgt. Gori approached Plaintiff, reprimanded her for failing to report to him upon her arrival, and informed her that he was changing her shift. Plaintiff became angry and challenged Sgt. Gori in the presence of other command rank officers, including Sgt. Craig Chromoga, the acting commander at the hostage call. When Sgt. Gori later called Plaintiff on the telephone to discuss the shift change, she yelled at and eventually hung up on him.

On June 3, 2011, Plaintiff filed an "Equal Employment Opportunity Complaint Form" with the SLMPD's human resources department claiming that she had experienced sexual discrimination and retaliation. On the form, Plaintiff wrote: "I feel like I'm being sexually harassed by my Sgt. Gori, and since I'm not accepting his advancement [sic] he's started retaliating against me."[1] The same day, Sgt. Gori sent Plaintiff an email, which he copied to Lt. Deeba and Lt. Deeba's superior officer, Captain Gwen Spicer, summoning Plaintiff to a meeting in his office on June 6, 2011.

On June 6, 2011, Sgt. Chromoga completed a performance observation form (POF), at the request of Lt. Deeba, relating to the June 2 incident. Sgt. Chromoga alleged the following

---

[1] Plaintiff subsequently provided the HR department a three-page memorandum detailing the alleged discrimination and retaliation. Although the memorandum does not appear in the record, Plaintiff testified at trial that, beginning in 2008, Sgt. Gori frequently commented on Plaintiff's body, invited her on dates, and talked about having sex with her.

misconduct: "[Plaintiff] failed to notify her supervisor upon arrival at a 7250 on 06/02/11. [Plaintiff] was also reluctant to a duty hour change on 06/03/11 due to a detail." Sgt. Chromoga also checked boxes indicating "Improvement Needed" by Plaintiff in the areas of "Knowledge/compliance with rules and authority" and "Communication skills." Plaintiff also received an email from Lt. Deeba on June 6, 2011, admonishing: "It is not a subordinates [sic] job to question a [sic] order. It is not a subordinates [sic] job to wonder where the sergeant is. A subordinate should not be [sic] disrespectfully, insubordinate, and act irrational."

Plaintiff began an approved medical leave on June 15, 2011 and returned to work on September 26, 2011. While Plaintiff was on leave, Lt. Deeba received a report from an outside EEO consultant finding Plaintiff's EEO complaint to be "without merit." However, the investigator recommended that the HR department: refer the matter to the internal affairs division "for further action related to the poster";[2] counsel Sgt. Gori with regard to the SLMPD's EEO policy and "how to communicate professionally and legally with employees"; and continue having Plaintiff "report to someone other than Sergeant Gori."

On September 1, 2011, Lt. Deeba emailed the following request to Capt. Spicer:

> [Plaintiff] initiated a complaint against me and Sergeant Gori. The findings of this complaint have been returned to both of us by the EEOC

---

[2] In 2009, Plaintiff received a copy of a mock "wanted" posted with her photograph. The poster read:
> WANTED SUBJECT
> FOR HAVING THE MOST DANGEROUS BODY IN THE STL
> Tanisha Ross/Paige – aka "Apple Bottom"
> …
> Subject wanted for having the "BADDEST BODY" in the St. Louis area.
> Use extreme caution when approaching this subject. Approach this subject from behind for your own safety.
> To Be Considered Dangerous

The SLMPD's internal affairs department discovered that the wanted poster was forwarded from Sgt. Gori's email address.

consultant, Mrs. Marti Bloodsaw. The findings for the sexual harassment and retaliation complaint were determined to be "without merit."

As you are aware, since the beginning of this erroneous complaint to the completion of this investigation, this officer has disrupted the operations of both SWAT and Canine.

Further, I have been approached by every member of the Canine Unit, who feel unsafe and do not trust this officer and do not want to work with her.

I request that [Plaintiff] be transferred immediately and I post this critical position.

On September 19, 2011, Lt. Deeba sent another email requesting Plaintiff's transfer. Lt. Deeba addressed the email to Col. Antoinette Filla and copied it to Capt. Spicer, Sgt. Carlos Ross,[3] and the entire canine unit. This email stated:

. . . . I spoke to HR today before I received your email and they advise that in the eeoc [sic] recommendation that [Plaintiff] indefinitely should not report to Sgt. Gori.

That is what Mrs. Hicks told me from HR and that it had no restrictions on me. Per HR and the EEOC I was never a focus of a [sic] investigation[.] I was interviewed as a witness.

This officer has several discipline issue [sic] pending, a shots fired, and further remedial training BEFORE she returns to work. I have given all of this to Captain Spicer when I was removed from the Chain of Command.

[Plaintiff] was at the office today attempting to retrieve her car and dog. Officer Wilke called and told me this. I called her and told her this will not happen until she returns to work. She will also need 4 to 6 weeks of remedial training at the school due to the poor upkeep of her canine by her. That is per my lead canine trainer. Further, it will be my recommendation which I will submit in writing this week to you that due to [Plaintiff's] insubordination and poor work ethic she be removed from the Canine Unit. . . .

(emphasis in original). Upon Plaintiff's return from medical leave, she and Duncan completed four weeks of remedial training.

Plaintiff resumed work in the canine unit in October or November 2011. On November 20, 2011, Lt. Deeba sent an email to Plaintiff, Sgt. Ross, Capt. Spicer, Col. Filla, and the entire

_____

[3] After Plaintiff filed her EEO complaint, the SLMPD removed her from Sgt. Gori and Lt. Deeba's chain of command, and Plaintiff began reporting to Sgt. Ross of the traffic safety division.

4

canine unit prohibiting Plaintiff from using the computers in the canine unit office. Plaintiff did not receive the required monthly training in November and December 2011.

During a monthly street-training session on January 4, 2012, another officer's canine attacked Plaintiff, causing injury to Plaintiff's left ankle and knee. Plaintiff required ongoing treatment for her knee injury, during which time she worked in the SLMPD's communications department. In February 2012, the SLMPD "kenneled" Duncan and denied Plaintiff permission to visit him. On April 4 and 5, 2012, two female canine officers emailed Lt. Deeba requesting Plaintiff's transfer to a different unit.

On October 5, 2012, James Buntin, assistant director of the SLMPD's HR department, sent Plaintiff a letter informing her that her physician "has placed permanent restrictions on you and has placed you at MMI (Maximum Medical Improvement)." In a letter dated November 21, 2012, he informed Plaintiff that the Board "approved the recommendation to drop you from the rolls of the [SLMPD] effective November 21, 2012, due to your permanent medical restrictions." Approximately one week later, Lt. Deeba submitted a report recommending that Duncan be retired and "donated to the care of" a department employee.

Plaintiff subsequently applied for disability benefits. Plaintiff attended a hearing regarding entitlement to disability benefits in May 2013. At the time of her trial in March 2014, she had not yet received a decision.

Plaintiff filed claims with the Missouri Human Rights Commission in October 2012 and November 2012. After receiving notices of right to sue, she filed suit under the MHRA alleging that Sgt. Gori, Lt. Deeba, and the SLMPD discriminated against her on the basis of sex and retaliated against her for filing the EEO complaint.

5

The trial court conducted a five-day, bifurcated jury trial in March 2014. At the close of Plaintiff's evidence, the Board moved for a directed verdict. In regard to Plaintiff's retaliation claim, counsel for the Board argued:

> [T]here was no adverse employment action. [Plaintiff] was never demoted, she was never fired, she was never transferred. She left for medical leave on her own accord. There has been no evidence of an adverse action.
>     To the extent the plaintiff wants to argue that not getting disability in a different proceeding is an adverse employment action, that's simply – that simply was never pled, so any claims regarding disability should be dismissed. A dog bite from another officer is clearly not an employment action, and receiving an email wanting her to be transferred and then not being transferred is clearly not an adverse employment action.

The trial court stated that "this is a fact question for the jury," and it overruled the Board's motion. The Board renewed its motion for a directed verdict at the close of all evidence, asserting that Plaintiff "failed to make [a] prima facie case, each and every element of each and every claim." The trial court denied the motion.

After the first phase of the trial, the jury returned a verdict for the Board on Plaintiff's discrimination claim and a verdict for Plaintiff on her retaliation claim. The jury awarded Plaintiff $300,000 in compensatory damages and found Defendant liable for punitive damages. Following the second phase of trial, during which the jury heard argument regarding punitive damages, the jury assessed punitive damages in the amount of $7.2 million.[4]

The Board filed a motion for judgment notwithstanding the verdict (JNOV) arguing that Plaintiff failed to present substantial evidence: (1) of an adverse employment action; and (2) a causal relationship between the adverse action and her EEO complaint. The Board also filed a motion for new trial on the following grounds: (1) roving commissions in the verdict director for

---

[4] Plaintiff filed a post-trial motion to alter or amend the judgment by making an award of reasonable fees, and Defendant filed a motion to reduce the punitive damages award based upon the statutory cap set forth in Section 510.265. The trial court subsequently entered a judgment increasing compensatory damages to $510,190 and reducing punitive damages to $2,550,950.

retaliation; and (2) juror misconduct. After hearing arguments, the trial court entered an order denying the motions. The Board appeals.

### *Standard of Review*

"Whether a jury was instructed properly is a question of law this [c]ourt reviews *de novo*." Hervey v. Mo. Dep't of Corr., 379 S.W.3d 156, 159 (Mo. banc 2012). We review the record in the light most favorable to submission of the instruction. Hayes v. Price, 313 S.W.3d 645, 650 (Mo. banc 2010). "Instructional errors are reversed only if the error resulted in prejudice that materially affects the merits of the action." Hervey, 379 S.W.3d at 159 (quotation omitted). "To reverse on grounds of instructional error, the party challenging the instruction must show that the offending instruction misdirected, misled or confused the jury, and prejudice resulted." Powderly v. S. County Anesthesia Assocs., Ltd., 245 S.W.3d 267, 276 (Mo.App.E.D. 2008) (citing Dhyne v. State Farm Fire & Cas. Co., 188 S.W.3d 454, 458 (Mo. banc 2006)).

We review a trial court's decision to deny a motion for new trial based on juror misconduct for an abuse of discretion. Travis v. Stone, 66 S.W.3d 1, 3 (Mo. banc 2002). "A trial court's ruling on a motion for new trial based on juror misconduct is given great weight, and the appellate court may reverse that ruling only 'if it appears that the trial court abused its discretion in ruling on the issue of extraneous evidence or the issue of prejudice.'" Williams v. Daus, 114 S.W.3d 351, 365 (Mo.App.S.D. 2003) (quoting Travis, 66 S.W.3d at 3). A trial court abuses its discretion "when the ruling offends the logic of the circumstances or was so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration." Id. (quotation omitted).

7

*Discussion*

*1.  Instructional error*

In the Board's first point on appeal, it claims that the trial court erred in submitting Instruction No. 8, the verdict director for retaliation, because each element of the disjunctive submission was not supported by substantial evidence.  More specifically, the Board contends that Plaintiff failed to present substantial evidence to support two of verdict director's seven disjunctive elements – namely, that the Board "denied the plaintiff paid time off to attend training" or "unjustly refused or delayed plaintiff's disability claim."  Plaintiff counters that the Board did not preserve this claim for review and further asserts that substantial evidence supported each element of the verdict director.

"Any issue submitted to the jury in an instruction must be supported by substantial evidence from which the jury could reasonably find such issue."  Hemphill v. Pollina, 400 S.W.3d 409, 416 (Mo.App.W.D. 2013) (quotation omitted).  "Substantial evidence is evidence which, if true, is probative of the issues and from which the jury can decide the case."  Id.  We review the record in the light most favorable to submission of the instruction.  Hayes, 313 S.W.3d at 650.  "When an instruction is given in the disjunctive, the plaintiff must introduce evidence that supports the submission of each allegation."  Meyer v. Lockard, 118 S.W.3d 245, 250 (Mo.App.W.D. 2003).  See also Powderly, 245 S.W.3d at 277.  "If each allegation presented in the instruction is not supported by the evidence, and the giving of the instruction is not supported by the evidence, then the giving of the instruction is error."  Id.

As an initial matter, we consider whether the Board preserved the particular instructional error asserted on appeal, namely that Instruction No. 8 included disjunctive elements that were unsupported by substantial evidence.  "In order to assign as error the giving or failure to give an

8

instruction, a party 'must make *specific* objections to the giving or failure to give instructions before the jury retires to consider its verdict; the objections and grounds therefore must be stated *distinctly* on the record, and the objections must also be raised in the motion for new trial.'" Berra v. Danter, 299 S.W.3d 690, 702 (Mo.App.E.D. 2009) (emphasis in original) (quoting Sparkman v. Columbia Mut. Ins. Co., 271 S.W.3d 619, 624 (Mo.App.S.D. 2008)). See also Rule 70.03.[5] "A vague, general objection preserves nothing for review because it does not allow the trial court to make an informed ruling on the validity of the objection." Id. See also Goralnik v. United Fire & Cas. Co., 240 S.W.3d 203, 210 (Mo.App.E.D. 2007). Accordingly, when objecting to a proffered disjunctive instruction on the grounds that it is not supported by substantial evidence, a party must: (1) direct the trial court's attention to the specific element alleged to be unsupported by evidence in the record; and (2) explain "why in the context of the evidence presented during the trial the specified element is not supported by the evidence[.]" Sparkman, 271 S.W.3d at 625. We may not review on appeal an instructional error that was not properly raised before the trial court. Giddens v. Kansas City S. Ry. Co., 29 S.W.3d 813, 823 (Mo. banc 2000).

Following the close of the evidence, the trial court held an instruction conference during which counsel for the SLMPD reasserted the argument, presented in support of its earlier motions for directed verdict, that Plaintiff failed to make a submissible case of retaliation

---

[5] Rule 70.03 provides, in pertinent part:

> Counsel shall make specific objections to instructions considered erroneous. No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection . . . . The objections must also be raised in the motion for new trial . . . .

9

because she presented no evidence demonstrating that the SLMPD took adverse employment against her in violation of the MHRA.[6] With respect to Instruction No. 8, defense counsel stated:

> Instruction No. 8, again, I'll read it. Our objection in the entirety, or gave plaintiff a negative write-up or assigned plaintiff unfavorable shifts or denied plaintiff paid time off to attend training or failed to allow the plaintiff to apply for the sergeant's exam, as there's no evidence of those allegations, and they're not tangible employment actions.
>
> In addition, we object to the phrase, or unjustly refused or delayed plaintiff's disability claim, as, again, there's no evidence of this. It's not a tangible employment action. In fact, the defendants have no authority or control over plaintiff's disability, which was shown on the record, and this claim would be correctly asserted against a defendant not in this party, or in this claim.
>
> We also object on the second element that or refusal to submit to sexual advances, just that phrasing itself, as it doesn't correctly state the law.
>
> In addition, we propose that there would be another element saying that, first, plaintiff had to file her complaint of harassment or retaliation before these acts could trigger retaliation.

Counsel was clearly focused on the submissibility of the claim, i.e. Plaintiff's failure to prove a "tangible employment action," rather than on the defectiveness of the verdict director. As counsel for the Board acknowledged at oral arguments, the Board's "position at that time was there was no submissible case."

The trial court submitted Instruction No. 8 as follows:

> Your verdict must be for plaintiff and against defendant Saint Louis Board of Police Commissioners on plaintiff's claim of unlawful retaliation if you believe:
>
> First, defendant discharged plaintiff or gave plaintiff a negative write up or assigned plaintiff with unfavorable shifts or denied the plaintiff paid time off to attend training or failed to allow the plaintiff to apply for the sergeant's exam or unjustly refused or delayed plaintiff's disability claim or created a severe and pervasive hostile environment for the plaintiff, and

---

[6] "To establish a prima facie case of retaliation under the MHRA, a plaintiff must prove that: (1) [s]he complained of discrimination; (2) the employer took adverse action against [her]; and (3) a causal relationship existed between the complaint and the adverse action." McCrainey v. Kansas City Mo. Sch. Dist., 337 S.W.3d 746, 753 (Mo.App.W.D. 2011).

10

Second, plaintiff's complaint of sexual harassment or refusal to submit to sexual advances was a contributing factor in such discriminatory acts, and

Third, as a direct result of such conduct, plaintiff sustained damage.

After the trial, the Board filed a motion for JNOV renewing the argument (previously presented in its motions for directed verdict and at the instruction conference) that Plaintiff failed to make a submissible case. The Board asserted that Plaintiff "failed to present substantial evidence for every fact essential to establish liability on her claim for retaliation." According to the Board, Plaintiff "failed to prove the second and third elements of her retaliation claim – that any adverse employment action was taken against her following the [EEO] complaint, or that there was a causal relationship between her grievance and any adverse employment action."

In its contemporaneously filed motion for a new trial, the Board raised instructional error for the first time, arguing that Instruction No. 8 gave the jury a roving commission. Specifically, the Board claimed that Instruction No. 8 was improper because it: (1) "misstated Missouri law on retaliation and constituted a roving commission"; (2) "included purported acts by defendant which were not actionable retaliatory adverse employment actions" and was, therefore, a roving commission; and (3) "failed to include the required element that the plaintiff engaged in protected activity," which allowed the jury "to find retaliation for actions that occurred before [P]laintiff made a complaint of sexual harassment."[7] (emphasis in original).

---

[7] In the Board's memorandum in support of its motion for new trial, it argued, as it does on appeal, that the trial court erred in submitting Instruction No. 8 to the jury because it "included actions for which there was no substantial evidence." In its reply brief, the Board argues that raising an issue in a supporting memorandum is sufficient to preserve it. We need not address this argument because the Board did not raise the instructional error during trial as required by Rule 70.03. The Board's argument in its motion for new trial "does not remedy [its] failure to register specific objections . . . during the instruction conference as required by Rule 70.03." Edwards v. Gerstein, 363 S.W.3d 155, 170 (Mo.App.W.D. 2012).

11

The Board neither appeals the trial court's denial of its motion for JNOV, which attacked the submissibility of Plaintiff's retaliation case, nor challenges Instruction No. 8 on the basis of roving commission, as it did in its motion for new trial. Rather, the Board asserts problems with the disjunctive nature of the instruction that it did not bring to the trial court's attention either in its objections at the instruction conference or in its motions for directed verdict, motion for JNOV, or motion for new trial.

The Board argues on appeal that Instruction No. 8 was erroneous because, by submitting a disjunctive instruction, Plaintiff was required to support each element with substantial evidence. The Board's point relied on states:

> The trial court erred in submitting the retaliation instruction (Instruction 8) because the instruction submitted alternative theories of recovery, not all of which were supported by substantial evidence, in that there was no evidence that the Board "denied the plaintiff paid time off to attend training," and there was no competent evidence that the Board "refused or delayed plaintiff's disability claim."

The Board's objection at trial and post-trial motions neither challenged the disjunctive nature of Instruction No. 8 nor specifically and distinctly asserted that Plaintiff's instruction was defective for failing to support the disjunctive submissions. Instead, the Board focused on the lack of "tangible employment actions" and causal relationship between Plaintiff's protected activity and the alleged adverse actions. In addition, the Board did not offer an alternative instruction or request that the trial court delete from Instruction No. 8 the problematic disjunctive elements. "The trial court has no obligation to ferret out specificity, which a party chooses not to distinctly articulate in its objection, in order to make an informed ruling on a general objection." McCrainey, 337 S.W.3d at 755. We cannot conclude, on this record, that the Board sustained its burden under Rule 70.03 "to register a specific objection to the verdict director . . . that was

12

designed to avert error or to allow the circuit court to make an intelligent ruling." Edwards v. Gerstein, 363 S.W.3d 155, 170 (Mo.App.W.D. 2012).

Even if the Board's attack on Instruction No. 8 were preserved, the Board has failed to demonstrate reversible error. As previously stated, we review the record in the light most favorable to submission of the instruction. Bach v. Winfield-Foley Fire Protection Dist., 257 S.W.3d 605, 608 (Mo. banc 2008). "Instructional errors are reversed only if the error resulted in prejudice that materially affects the merits of the action." Id.

The Board claims that "there is no evidence – much less substantial evidence – to support the theory that the Board denied [Plaintiff] paid time off to attend training." The Board concedes that there was "extensive evidence" about training and, indeed, five pages of Plaintiff's brief is devoted to referencing testimony about training. In essence, Plaintiff's evidence established that, in the months following her complaints of harassment, she was required to undergo training, she was unable to obtain the necessary training, and her failure to do so led to criticism.[8] Officer Carol Seithel, head trainer of the SLMPD's canine division, testified that the SLMPD required canine officers to train with their dogs "approximately sixteen hours per month." According to Officer Seithel, Plaintiff completed no required training in November and December 2011. Lt. Deeba and Officer Joseph Dobbs, another trainer with the canine unit, stated that missing two months of required training was "unacceptable." Officer Dobbs's testimony that Officer Seithel finally scheduled Plaintiff for training on January 4, 2012, suggests that the SLMPD was

---

[8] The Board contends that Plaintiff repeatedly changed her theory regarding training. The Board's arguments are in the nature of attacks on the weight of the evidence. "This court may not rule on the weight of the evidence in a jury-tried case." Armon v. Griggs, 60 S.W.3d 37, 40 (Mo.App.W.D. 2001).

13

responsible for scheduling training.[9]  Although we agree that were we the factfinders we might conclude otherwise, a review of the record persuades us that a jury could reasonably infer that, following her complaint, the SLMPD denied required training to Plaintiff.

The Board also contends that there was "no competent evidence" that the Board refused Plaintiff's disability claim.  According to the Board, "there could be no competent evidence to establish this point because, under Missouri law, exclusive authority over [Plaintiff's] application for Disability Retirement – which is the 'disability claim' at issue – lies with the Board of Trustees of the Police Retirement System."   Plaintiff counters that the Board's argument relates solely to retirement disability, but Instruction No. 8 referred to long-term disability.  Plaintiff further asserts that there was substantial evidence that the Board "contributed to cause a delay or denial in [Plaintiff's] receipt of disability benefits."

Plaintiff testified that she was permanently disabled by the injury she sustained from the dog attack in January 2012.  Plaintiff identified her "application for retirement and disability" and described the benefits she expected to receive.  Plaintiff stated that she attended a hearing on her application and "was told that I would be contacted and advised as to what the outcome was going to be."  This exchange followed:

> [COUNSEL]:  Have you heard anything at all from this board since then?
> [PLAINTIFF]:  Nothing at all.
> [COUNSEL]:  Have you received a single cent in disability from this department?
> [PLAINTIFF]:  No, I have not.

The Board, in turn, presented Monica Green, the HR manager responsible for the SLMPD's benefits programs, who explained the distinction between long-term disability, which

---

[9] In her cross-examination of Officer Seithel, Plaintiff adduced evidence that Officer Seithel actively supported Lt. Deeba's efforts to remove Plaintiff from the canine unit.

was paid by the Board, and retirement (or pension) disability, which was paid by the Police Retirement System of St. Louis. Ms. Green stated that the Board paid Plaintiff $20,432.67 in long-term disability benefits. Ms. Green clarified that the Board had no control over the Police Retirement System, a separate entity responsible for disability retirement benefits. "[A] jury is free to believe any, all, or none of a witness's testimony." Mitchell v. Kardesch, 313 S.W.3d 667, 675 (Mo. banc 2010). Based on Plaintiff's testimony that she had not "received a single cent in disability from this department," a jury could reasonably infer that, following her complaint of discrimination, she was refused disability benefits. Point denied.

### 2. *Juror Misconduct*

In its second and final point, the Board claims the trial court erred in overruling the Board's motion for a new trial based on juror misconduct. More specifically, the Board contends that it was entitled to a "strong presumption of prejudice" because "a juror conducted an independent, internet investigation into the question 'Where do punitive damages go?'" In response, Plaintiff asserts that the trial court did not err in overruling the Board's motion for a new trial because the information gathered by the juror was not extrinsic factual evidence and there was no evidence of prejudice.

The general rule, known as the Mansfield rule, "is that a juror's testimony about jury misconduct allegedly affecting deliberations may not be used to impeach the jury's verdict." Travis v. Stone, 66 S.W.3d 1, 4 (Mo. banc 2002). Courts recognize an exception to this general rule, however, and allow a party to attack a verdict with evidence of juror misconduct that "occurred outside the jury room, such as the alleged gathering of extrinsic evidence . . . ." Id. "That is to say that the juror testimony must allege that extrinsic evidentiary facts (i.e., facts bearing on trial issues but not properly introduced at trial) were interjected into the jury's

15

deliberations . . . ."[10]  Williams v. Daus, 114 S.W.3d 351, 365 (Mo.App.S.D. 2003) (quoting

Neighbors v. Wolfson, 926 S.W.2d 35, 37 (Mo.App.E.D. 1996)).   "Extrinsic evidentiary facts

enter a jury's deliberations when, for example, a juror visits an accident scene without the court's

authorization and then shares his observations with his fellow jurors, or when a juror brings a

newspaper into the jury room and reads an article from it to the venire."  Neighbors, 926 S.W.2d

at 37 (internal citations omitted).   See also Williams, 114 S.W.3d at 365.   Once the non-

prevailing party has established that a juror gathered extrinsic evidentiary facts, "the burden

shifts to the opposing party to show that no prejudice resulted from it."  Travis, 66 S.W.3d at 4.

At the start of trial, the trial court read the following instruction to the jury:

> *You must not conduct any independent research or obtain any information of any type by reference to* any person, textbooks, dictionaries, magazines, *the use of the internet* or any other means about any issues of this case or any witnesses, parties, lawyers, medical or scientific terminology or evidence that is in any way involved in this trial.

(emphasis added).[11]  Several days after the jury returned its verdict, the Board's trial counsel

learned that, despite the trial court's admonishments, juror Kevin Hink googled the inquiry

---

[10] In contrast, a party may not attack a verdict with juror testimony relating to "matters inherent in the verdict," such as allegations that:
> the juror did not understand the law as contained in the court's instructions, or that he did not join in the verdict, or that he voted a certain way due to a misconception of the evidence, or misunderstood the statements of a witness, or was mistaken in his calculations, or other matters "resting alone in the juror's breast."

Stotts v. Meyer, 822 S.W.2d 887, 889 (Mo.App.E.D. 1991) (quoting Baumle v. Smith, 420 S.W.2d 341, 348 (Mo. 1967)).

[11] Additionally, prior to each break, the trial court admonished the jury:
> Please do not read, view or listen to any newspaper, radio or television report on the trial.  Do not do any research or investigation on your own regarding the case.   Until you are discharged as jurors, the prohibition on electronic communications and internet use related to the case is in effect.   This prohibition applies to all electronic devices such as smart phones, laptops, or iPads, all forms of electronic communication such as email, text messages or blogging, and internet research tools and social media like Google, Facebook

16

"where do punitive damages go?" during the second phase of trial. In its motion for new trial, the Board argued it was entitled to "a new trial on the limited issue of the amount of punitive damages because of jury misconduct during deliberations." The Board filed with its motion the affidavits of its trial attorneys stating that, after the trial, a juror told them he had googled punitive damages during deliberations.[12]

The trial court conducted a hearing on the Board's motion for new trial at which it elicited testimony from Juror Hink. At the hearing, Juror Hink testified that, during deliberations on the issue of punitive damages, he used his cell phone to "Google[] what a punitive damage was," and the first link his search retrieved was a Wikipedia article.[13] Juror Hink stated that he read aloud the first few sentences of the article but could not "say with certainty whether people heard me or not . . . ." Juror Hink recalled either reading or summarizing the following lines of the Wikipedia article:

> [P]unitive damages or exemplary damages are damages intended to reform or deter the defendant and others from engaging in conduct similar to that which form the basis of the lawsuit. Although the purpose of punitive

---

or Twitter. You are still free to use electronic communications and the internet outside of the courtroom, but only for purposes wholly unrelated to the case.

[12] Plaintiff filed a motion to strike affidavits of defense counsel on hearsay grounds. Although no objections to the juror's testimony appears in the transcript from the hearing, the trial court's judgment stated: "Plaintiff opposed the request for an evidentiary hearing contending this is not a case in which a juror gathered extrinsic evidence concerning matters under deliberation or where the alleged misconduct was extrinsic to the jury's verdict." However, Plaintiff does not argue that the trial court erred in admitting the juror's testimony and, in fact, relies on that testimony to support her contention that the trial court properly found that the extrinsic evidence did not prejudice the jury.

[13] Wikipedia is an "open access" internet encyclopedia. U.S. v. Lawson, 677 F.3d 629, 634 (4th Cir. 2012) (applying the presumption of prejudice to juror misconduct by consulting a dictionary or encyclopedia). "Wikipedia is written collaboratively by largely anonymous internet volunteers who write without pay. Anyone with internet access can write and make changes to Wikipedia articles (except in certain cases where editing is restricted to prevent disruption or vandalism)." Id. at 650 (quoting http://en.wikipedia.org/wiki/Wikipedia:About). Juror Hink provided the trial court printouts of his Google search results and the Wikipedia article on punitive damages.

> damages is not to compensate the plaintiff, the plaintiff will receive some or –
> all or some portion of the punitive damage award.
> [P]unitive damages are often awarded where compensatory damages are
> deemed an inadequate remedy.

Juror Hink explained that he performed this internet search because "it was one of many questions that we [jurors] were asking each other . . . . And I guess I felt inadequately informed to render that kind of an opinion."

Juror Hink testified that he did not believe the information he obtained on the internet was "decisive in determining the amount of damages" and that the jury did not agree upon an amount of punitive damages until "a while" after his Google search. However, Juror Hink acknowledged that he "was the one that made the final suggestion of seven [million dollars]." Juror Hink explained:

> I had to come up quite a bit from where I was originally at in my – in my mind.
> I didn't really get uncomfortable until we were up over five, but I – the brevity
> of the debate and the – and what I mean by that is everybody wanted to get out
> of there, and so that was just a last ditch effort to bring in people who were
> pretty far apart.

Juror Hink affirmed that he did not "Google any particularized questions using any names of the parties or witnesses in this case."

After the hearing, the trial court entered a written order finding that "what the juror did here was clearly wrong" and "in stark defiance of repeated admonitions by this Court not to access GOOGLE concerning the case . . . ." (emphasis in original). However, the trial court found that the information Juror Hink obtained was not the type of extraneous evidence to trigger the presumption of prejudice and that there was "no[] prejudice as would warrant the setting aside of the jury's verdict."

The Board maintains that "[r]eading the Wikipedia article is no different from bringing a map or a newspaper into the jury room," which has been held to trigger the presumption of

18

prejudice, and "should be treated no differently." (internal citation omitted). In support of its argument, the Board cites State ex rel. Koster v. McElwain, 340 S.W.3d 221 (Mo.App.W.D. 2011)[14] and Neighbors v. Wolfson, 926 S.W.2d 35 (Mo.App.E.D. 1996). In Koster, the Western District affirmed habeas relief for the criminal defendant, who was convicted of murdering his mother, because "a map that was not in evidence was provided to the jury at the jury's request and in the midst of its deliberations . . . ." Koster, 340 S.W.3d at 255. The State's theory at the defendant's trial required the jury to make "a reasonable inference" that the defendant could accomplish the geographic and temporal logistics of the crime. Id. at 257. Given the nature of the case, the jury clearly used the map to determine whether the defendant "could have murdered his mother in the manner theorized by the State." Id. The Koster court therefore concluded that the map contained extrinsic evidentiary facts and the State did not rebut the presumption that delivery of the map to the jury prejudiced the defendant. Id.

In Neighbors, this court found that "a booklet containing statements bearing on a central issue in the case" introduced extrinsic evidentiary facts into the jury's deliberations. Neighbors, 926 S.W.2d at 37-38. In that case, the plaintiff sued her obstetrician because he recommended the administration of Pitocin, which caused her uterus to rupture, resulting in severe brain damage to her baby. Id. at 37. The jury returned a verdict for the defendant obstetrician, and the plaintiff moved for an evidentiary hearing to investigate possible juror misconduct because "one of the jurors, a former insurance adjuster, had brought a booklet into the jury room that discussed the use of Pitocin and apparently presented it in a favorable light." Id. The trial court denied the

---

[14] "No rational basis appears for distinguishing between civil and criminal cases as to the issues presented." State v. Stephens, 88 S.W.3d 876, 882 n.3 (Mo.App.W.D. 2002).

plaintiff an evidentiary hearing, and she appealed. Id. On appeal, this court found that the booklet constituted extrinsic factual evidence relating to a "central issue" in the case.[15] Id. at 38.

Unlike the map and informational booklet at issue in Koster and Neighbors, the Wikipedia article acquired by Juror Hink neither related to a factual determination that was essential to resolution of the case nor supported the viability of either party's theory. Importantly, juror Hink's Google search posed a legal question rather than a factual question. In other words, the jury did not have to answer the question "where do punitive damages go?" to reach a verdict in this case. See e.g., U.S. v. Blumeyer, 62 F.3d 1013, 1017 (8th Cir. 1995).

Although not precedential, U.S. v. Cheyenne provides useful guidance in this case. 855 F.2d 566 (8th Cir. 1988). In Cheyenne, the jury referenced a pocket dictionary during deliberations to define the terms "callous" and "wanton." Id. at 567. The United States Court of Appeals for the Eighth Circuit held that the jury's self-instruction on a legal definition was not presumptively prejudicial because it did not relate to the facts under deliberation or "bear[] on the defendant or on the acts alleged in the indictment." Id. at 568. The court explained: "Where, as in this case, the jury simply supplements the court's instructions of law with definitions culled from a dictionary, it remains within the province of the judge to determine whether the conduct distorted the jury's understanding of the law to the prejudice of the defendant." Id. The court concluded that the trial court did not abuse its discretion in holding

_____

[15] The Neighbors court nonetheless affirmed the trial court's judgment denying the plaintiff a post-trial evidentiary hearing because the defendant properly objected to the juror testimony "thereby rendering the jurors incompetent to give testimony tending to impeach their verdict." Neighbors, 926 S.W.2d at 38. "[I]t is currently unclear whether the absence of an objection is an absolute prerequisite to the admissibility of juror testimony in Missouri." Mudd, James R., *Liberalizing the Mansfield Rule in Missouri: Making Sense of the Extraneous Evidence Exception After* Travis v. Stone, 69 Mo. L. Rev. 779, 787 (Summer 2004). "Courts are inconsistent as to whether the absence of objection is a necessary element in establishing the admissibility of juror testimony or merely an independent exception to the Mansfield Rule." Id.

that the jury's improper use of a dictionary did not prejudice the defendant.  Id.  See also Yannacopoulos v. Gen. Dynamics Corp., 75 F.3d 1298, 1304 (8th Cir. 1996); Blumeyer, 62 F.3d at 1017.

In the instant case, Juror Hink's act of researching punitive damages and reading a Wikipedia article was similar to the Cheyenne jury's use of a dictionary.  The information Juror Hink obtained from Wikipedia defined the legal term "punitive damages" and explained their purpose in a manner consistent with the trial court's instructions and Missouri law.  See, e.g., State v. Suschank, 595 S.W.2d 295, 298 (Mo.App.E.D. 1979).  Most importantly, the information contained in the article neither related to a disputed factual issue nor supported Plaintiff's theory of the case.  Nor did the Wikipedia article either support or undermine witness credibility.  See, e.g., State v. Cook, 676 S.W.2d 915, 917 (Mo.App.E.D. 1984).  We therefore conclude that Juror Hink's independent, outside research, while improper, did not reveal extrinsic, evidentiary facts creating a presumption of prejudice.[16]  The trial court did not abuse its discretion in denying the Board a new trial on punitive damages based on juror misconduct.  Point denied.

### *Conclusion*

The judgment of the trial court is affirmed.

---

[16] The Board argues that "the internet search here was not analogous to consulting a dictionary" because:  (1) the internet is not limited to "standard definitions of words only" but rather contains "a vast universe of knowledge and opinions"; and (2) Juror Hink sought, not a legal definition, but the answer to a legal question.  We primarily base our decision in this case on the information Juror Hink sought and obtained, and not on the specific resource he consulted.

21

_____
Patricia L. Cohen, Presiding Judge

Roy L. Richter, J., and
Robert M. Clayton III, J., concur.